1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TEREBEA JEAN WILLIAMS,

11              Petitioner,              No. CIV S-05-0058 LKK GGH (TEMP) P[1]

12        vs.

13   DEBORAH JACQUEZ,

14              Respondent.          FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges her 2001 conviction in the

18   Yolo County Superior Court on charges of first degree murder, kidnapping, and carjacking, with

19   findings that petitioner personally used a firearm, discharged a firearm, and discharged a firearm

20   causing death.  She seeks relief on the grounds that her due process rights were violated by jury

21   instruction error and her Fifth Amendment right against self-incrimination was violated by the

22   admission into evidence of her statements to police.  Upon careful consideration of the record

23   and the applicable law, the undersigned will recommend that petitioner's application for habeas

24   corpus relief be denied in its entirety.

25   _____

26        [1] This case was reassigned to the undersigned in January 2011.

1

I.  Proceedings in this Court

On January 11, 2005, petitioner filed a petition for writ of habeas corpus in this court.  By order dated April 8, 2005, that petition was dismissed with leave to file an amended petition on the proper court form.  On May 9 2005, petitioner filed an amended petition for writ of habeas corpus.  On February 6, 2006, petitioner filed a motion to stay this action pending exhaustion of six claims in state court.  On August 11, 2006, the magistrate judge assigned to this action filed findings and recommendations which recommended that petitioner's motion for stay be denied and that petitioner be granted leave to file a second amended petition containing only exhausted claims.  On September 13, 2006, petitioner filed a second amended petition.  On September 27, 2006, the August 11, 2006 findings and recommendations were adopted by the district judge assigned to this case.  Respondent filed an answer to the September 13, 2006 amended petition on May 17, 2007.  On May 21, 2008, the court ordered the appointment of counsel for petitioner.  A status conference was held on June 18, 2008, after which the court granted petitioner 90 days to submit additional briefing on the claims contained in the September 13, 2006 amended petition.  After several extensions of time, petitioner filed supplemental points and authorities on March 23, 2009 and August 20, 2009.  Respondent filed a supplemental answer on May 21, 2009.

II.  Background[2]

> A jury convicted defendant Terebea Jean Williams of first degree murder (Pen. Code, § 187), kidnapping (Pen. Code, § 207, subd. (d)), and carjacking (Pen. Code, § 215, subd. (a)), while rendering true findings as to personal firearm use (Pen. Code, § 12022.5, subd. (a)) and discharge of a firearm causing death (Pen. Code, § 12022.53, subd. (d)).  She was sentenced to state prison for an aggregate term of 84 years to life.

* * *

---

[2]  This statement of facts is taken from the May 20, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Op.), lodged in this action on May 17, 2007.  See Respondent's Lodged Document D.

2

Around 7:30 a.m. on February 28, 1998, California Highway Patrol (CHP) Officer James Carter observed a 1985 Oldsmobile Cutlass traveling northbound on Interstate 5 in Colusa County at 80 miles per hour.  Carter stopped defendant, who was driving, and advised her he had clocked her speeding.  Defendant appeared abnormally nervous – her hand was "shaking pretty good" as she handed over her driver's license.  Carter noted that the vehicle was registered in the state of Washington to one Kevin Ruska (Ruska).  Defendant explained that the car belonged to her boyfriend; she said his name was "Kevin" but remained silent when asked to provide his last name.  Believing that many of her answers to his questions were deceptive, Carter asked for and obtained defendant's permission to search the car.

Carter initially patsearched defendant for weapons and recovered a gun magazine from her left front pocket.  He handcuffed her as she struggled with him and told her he knew she had a gun.  Defendant told him that the gun was "in the car."

After recovering a knife with a three-inch blade from her pocket, Carter placed defendant under arrest.  Under the driver's seat, he recovered a loaded Smith & Wesson nine millimeter semi-automatic revolver.  Officer Carter opened the trunk of the car and recovered Ruska's ATM and credit card from a hidden panel.  Lifting up the carpeting which covers the spare tire well, Carter discovered that the board and the area underneath were saturated with a red fluid he believed to be blood.  He also noticed what appeared to be a bullet hole, which had penetrated the board.  Carter became "concerned that somebody had been assaulted or been killed in the back of that car."

Defendant was turned over to the custody of Colusa County sheriffs' deputies and advised of her *Miranda* rights.  During a subsequent interview, defendant admitted that she had shot Ruska in the trunk of the car and left him in a Motel 6 somewhere in the Sacramento area.  Defendant accompanied the deputies as they drove around trying to locate Ruska.

In the meantime, at 1:45 p.m., employees at a Motel 6 in Davis discovered Ruska's dead body and called for help.  Emergency personnel arriving at room 251 found the room in total disarray.  Ruska's arms and feet were bound to a chair, which was tipped over.  He had a large blood stain on the front of his shirt.  A handcuff was attached to his left wrist.  There was duct tape around his mouth and the curtains had been duct-taped to the wall, so that no one could see inside the room.

Expert testimony established that the cause of Ruska's death was a gunshot wound to the abdomen.  The wound perforated his small bowel, leading to peritonitis, and making Ruska progressively ill.  The wound was consistent with the gun having been fired from not

3

more than two feet away, as the victim lay in the trunk.  A bullet recovered from the trunk was determined to have been fired from the gun found under defendant's driver's seat.

**Defense**

Taking the stand in her own defense defendant, who lived in Tacoma, Washington, testified that before she met Ruska, her previous boyfriend, Michael Soto, had stalked and threatened her. After they broke up, Soto became physically violent and abusive. Defendant got a restraining order against Soto and obtained a gun to protect herself.

Defendant became involved with Ruska through her employment. What started as a friendship evolved into a dating relationship. Defendant disclosed to Ruska her history with Soto as well as her prior "assaults and rapes."  On the two occasions when they had sex defendant told Ruska she felt like he had raped her, a remark which enraged him.  She then decided to break off the relationship.

After the breakup, Ruska became belligerent: he began "stalking" defendant and leaving messages on her answering machine.  They got into heated arguments during which Ruska would threaten her and act as if he were going to hit her, causing her to be afraid of him.

On the morning of February 28, 1998, Ruska stopped by defendant's residence to give her a ride to work, as her car was in the shop.  Enroute, they got into an argument and Ruska pulled off the freeway.  He began pushing defendant, throwing her belongings out of the car and acting as if he were going to punch her.  Ruska screamed at her to get out.  He taunted her, called her a "whore" and told her she enjoyed having been raped and molested.

Fearing for her safety, defendant pulled out her gun and ordered Ruska into the trunk.  She closed the trunk and drove, in a state of fear and panic.  At one point she stopped and opened the trunk. Ruska lunged at her, screaming obscenities, so she pulled the trigger of her gun.  She drove for hours without plan or direction. She ascertained Ruska had been shot, but she still feared him. Although she saw "some" blood, she had no idea if Ruska was seriously injured.

Exhausted, she stopped and registered at a Motel 6 in Davis and escorted Ruska to the motel room, with his hands tied.  Fearing for her safety, she handcuffed him and tied him to a chair with duct tape.  At the motel room, defendant called a friend and told her what happened.  The friend advised her to call the police and get help for Ruska, but defendant ignored her, believing that Ruska would come back and try to kill her.  Just before leaving the room, defendant gagged Ruska's mouth with the tape and untied one of

4

his legs so he could bang on an object to get attention.  She then left the room and drove on the freeway, where she was ultimately stopped by the police.

Dr. Linda Barnard was qualified as an expert on Battered Women's Syndrome (BWS).  She gave an opinion, based on interviews with defendant and reports of the crime, that defendant suffered from BWS as a cumulative result of her relationships with Michael Soto and Ruska.  Barnard explained that BWS affects the way a woman perceives danger.  Exposed to a traumatic situation, a battered woman may relive past traumas and experience flashbacks.  She may feel an exaggerated need to defend herself and may do so in a dissociative state.  Such a woman always feels a heightened sense of danger, and anger by the batterer only worsens the situation.  Even if she disables her attacker the battered woman may believe "he will get loose, he will get free, he will get well and then when he finds her, than she's really in trouble."

**Rebuttal**

The People called psychologist Sean Johnston as an expert in BWS.  Johnston contradicted Barnard's opinion that defendant was a victim of BWS, giving several reasons:  (1) Ruska never assaulted defendant; (2) defendant did not exhibit typical characteristics of helplessness and demoralization, and in fact may have been the dominant figure in the relationship; (3) defendant was not economically or emotionally dependent on Ruska; and (4) the manner in which the crime was committed, which displayed a considerable amount of choice-making and consideration of different options, was not the kind of impulsive violence one sees when BWS victims rise up against their batterers.

III.  <u>Standards for a Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[3]  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

The undersigned pauses here to especially recognize that the AEDPA standards are purposefully difficult for any petitioner who desires to overturn his/her conviction.  The Supreme Court has only recently emphasized in the strongest terms that state court convictions will not be overturned unless there is no reasonable support, either legal or factual, for the determinations of the state courts.

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

---

[3]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 118-20 (2007).

***

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter,  U.S.  , 131 S.Ct. 770, 775, 776-77 (2011).

The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from as that same word appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination.  A petitioner must show clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

"Clearly established" federal law is that determined by the Supreme Court.

7

1  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to

2  look to lower federal court decisions as persuasive authority in determining what law has been

3  "clearly established" and the reasonableness of a particular application of that law.  Duhaime v.

4  Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003),

5  overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at

6  782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court

7  precedent is misplaced).

8  IV.  Petitioner's Claims

9       A.  Fifth Amendment Claim

10              Petitioner claims her Fifth Amendment right against self-incrimination was

11  violated when her motion to suppress her statements to the police was denied by the trial court

12  and the statements were admitted into evidence at her trial.  The California Court of Appeal

13  denied this claim on the merits on direct appeal.  Respondent's Lodged Documents A & D.  The

14  California Supreme Court summarily denied the claim on petition for review.  Respondent's

15  Lodged Documents E & F.

16       1.  Background and State Court Decision

17              The California Court of Appeal fairly described the background to petitioner's

18  Fifth Amendment claim as follows:

19         The following facts were adduced at the hearing on the motion to
           suppress: CHP officers Carter and Reineman contacted Colusa
20         County Deputy Sheriff Randy Morton and informed him that
           defendant had been arrested with a loaded gun in her possession.
21         The officers told Morton that, while searching the trunk of the car
           Williams was driving, they had observed a liquid and asked that he
22         look at it.  Looking inside the trunk, Morton saw a large area
           covered with a wet red liquid that he believed to be human blood.
23         He also saw a hole in the floor of the trunk surrounded by the red
           liquid, which he believed to be a bullet hole.  Morton and detective
24         David Markss then interviewed Williams.  They were concerned
           that someone had recently been shot or might be dying, and they
25         sought an explanation.  Detective Markss read from a form to
           advise appellant of her *Miranda* rights and the following exchange
26         occurred:

8

1      "DETECTIVE:  Understanding these rights, do you wish to talk to
       me now?

2
       '[DEFENDANT]:  Uhmm, no.
3
       "DETECTIVE:  Don't want to talk to me?
4
       "[DEFENDANT]:  Do I want to talk to you?
5
       "DETECTIVE:  Yes.
6
       "[DEFENDANT]:  Oh, I don't care."[4]
7
       Defendant then signed a written waiver of her *Miranda* rights.  At
8      one point, during the interview, defendant stated, "I'm not going to
       keep answering all these questions . . .  I [sic] answer any questions
9      you have regarding the charge of the weapon . . . .  So I'm not
       answering nothing else, unless it has to do with my weapons
10     charge."  The interview did not terminate, however, and defendant
       continued to make statements implicating her in the charged
11     offenses.

12   Op. at 21-22.

13          The California Court of Appeal declined to analyze whether the police

14   "impermissibly questioned [petitioner] following an invocation of her Fifth Amendment rights."

15   (Id. at 20.)  Instead, the court held that any violation of petitioner's Fifth Amendment rights was

16   excused under California's "rescue doctrine."   (Id.)  The appellate court reasoned as follows:

17          The United States Supreme Court has long held that under
            emergency circumstances, the usual constitutional safeguards may
18          yield to higher considerations of public safety.  (See Maryland
            Penitentiary v. Hayden (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d
19          782, 787-788] [police in hot pursuit of robbery suspect may search
            residence for weapon without a warrant]; New York v. Quarles
20          (1984) 467 U.S. 649, 652, 655-656 [81 L.Ed.2d 550, 554-555, 556-
            557] [police apprehended rape suspect in a supermarket carrying an
21          empty gun holster and asked about location of gun; evidence
            properly admitted despite absence of Miranda warnings].)
22
            A corollary to this principle, the "rescue doctrine," has emerged as
23          a justification for refusing to apply Miranda's prophylactic rule

24

25          [4] [By the Court of Appeal] The videotape of the interview reveals that defendant's
     "Uhmm, no" response is barely audible and stated almost under her breath.  On the other hand,
     her statements "Do I want to talk to you?" and "Oh, I don't care," were spoken in normal, even
26   emphatic tones.

under circumstances where life or limb is in jeopardy and the need for interrogation imperative. As developed in California, the rescue doctrine applies if all of the following factors exist: First, there must be an urgency of need in that no other course of action promises relief. Second, there must be the possibility of saving human life by rescuing a person whose life is in danger. Lastly, rescue must be the primary purpose and motive of the interrogators. (People v. Riddle (1978) 83 Cal.App.3d 563, 576-577.) "For all practical purposes, the rescue doctrine under the Fifth Amendment and the emergency doctrine under the Fourth Amendment are one and the same to the extent they operate to protect life." (People v. Dean (1974) 39 Cal.App.3d 875, 886 (Dean).)

The facts here fall squarely within the scope of the rescue doctrine. The need for the interrogation was urgent. A considerable amount of blood and what appeared to be a bullet hole were found in the trunk of a car driven by defendant and a loaded gun found in her possession. The blood was fresh, raising the likelihood the shooting had taken place very recently. There also existed the possibility of saving human life. The officers could reasonably believe that a shooting victim, whose whereabouts was unknown, may have been lying injured somewhere and in need of medical attention. Finally, rescue was the primary motive for the interrogation. As Detective Markss testified:'

"Q. Did you have – after you received the initial information about the vehicle, the blood, the bullet hole, did you have some concerns about that?

"A. Several.

"Q. What were your concerns?

"A. That somebody was hurt, that somebody had been shot, somebody had died or is dying."[5]

---

[5] Markss's concerns were echoed by Deputy Morton:

"Q. Now, what was your primary purpose in interviewing [defendant] at that point?

"A: The fact that there was blood in the trunk and a bullet hole, we wanted to interview and find out what had happened.

"Q. Did you have some concern for the safety of anyone?

"A. Yes, ma'am, I did.

Defendant does not undertake a disciplined argument demonstrating that the elements of the rescue doctrine were not present.  Instead, she sweepingly asserts that the doctrine may not be used to violate the right to remain silent once invoked by an accused, declaring "[N]o case has held that in order to obtain a statement which might lead to a victim's rescue, an accused can be subjected to such techniques as physical violence or torture, which are similarly inconsistent with a defendant's right to be free from compelled self-incrimination."

Defendant raises a straw argument.  It is uncontroversial that the public safety exception is not so broad as to allow the police to obtain involuntary or coerced statements.  (See United States v. DeSantis (9th Cir. 1989) 870 F.2d 536, 540.)  However, there is no claim, nor does the record support, a finding that defendant's statements can be so characterized.

The fact that the statements were made after a purported invocation of the right to remain silent does not preclude application of the rescue doctrine, as illustrated in People v. Willis (1980) 104 Cal.App.3d 433, a case similar to ours.  There, 12 hours after an apparent kidnap victim had disappeared, Willis was arrested in a bedroom containing a lady's wristwatch and a ring of keys which were subsequently identified as property of the victim.  (Id., at p. 442.)  When the officers first advised him of his constitutional rights, he refused to waive them.  (Ibid.)  The police thereafter readvised him of his Miranda rights, obtained a waiver, and elicited incriminating statements.  (Id. at p. 446.)  Relying on the rescue doctrine, the Court of Appeal upheld the denial of defendant's motion to suppress his postarrest statements.  (Id., at pp. 448-449.)  The Willis court noted that it made no difference that the officers may have harbored dual motives in interrogating the defendant, i.e., rescue and incrimination:  "[S]o long as the developed facts show the motive behind the interrogation to be primarily that of rescue, the interrogation is justifiable despite an apparent Miranda violation."  (Id., at p. 449, original italics.)

We conclude the "rescue" doctrine was properly applied.  As stated in Dean, "[w]hile life hangs in the balance, there is no room to require admonitions. . . and to remain silent."  (Dean, supra, 39 Cal.App.3d at p. 882.)

Op. at 22-25.

Respondent argues that the decision of the California Court of Appeal rejecting

---

"Q.  What was your concern?

"A.  That somebody may be hurt."  (Italics added.)

1   petitioner's Fifth Amendment claim is a reasonable application of the "public safety" exception

2   to the Miranda doctrine set forth in New York v. Quarles, 467 U.S. 649 (1984).

3       2.   Does This Case Fall Within the Quarles Exception to the Miranda Rule?

4       *Does Incorporation of the Rescue Doctrine Into the Quarles Exception Violate*

5       *Clearly Established Supreme Court Authority*

6       "The prosecution may not use statements, whether exculpatory or inculpatory,

7   stemming from custodial interrogation of the defendant unless it demonstrates the use of

8   procedural safeguards effective to secure the privilege against self-incrimination." Miranda v.

9   Arizona, 384 U.S. at 444.  To this end, custodial interrogation must be preceded by advice to the

10  potential defendant that he has the right to consult with a lawyer, the right to remain silent and

11  that anything stated can be used in evidence against him. Id. at 473-74.

12      In Quarles, the United States Supreme Court created a "public safety" exception

13  to the Miranda rule, holding that Miranda warnings need not be given when "police officers ask

14  questions reasonably prompted by a concern for the public safety." 467 U.S. at 656.  The reason

15  for this exception is that "the need for answers to questions in a situation posing a threat to the

16  public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's

17  privilege against self-incrimination." Id. at 657.  Pursuant to the "public safety" exception, an

18  officer's questioning of a suspect in violation of Miranda is permissible if it "relate[s] to an

19  objectively reasonable need to protect the police or the public from any immediate danger . . . ."

20  Id. at 659 n.8.  In explaining the parameters of the public safety exception, the Supreme Court

21  stated as follows:

22          we recognize here the importance of a workable rule "to guide
            police officers, who have only limited time and expertise to reflect
23          on and balance the social and individual interests involved in the
            specific circumstances they confront."  (citation omitted).  But as
24          we have pointed out, we believe that the exception which we
            recognize today lessens the necessity of that on-the-scene
25          balancing process.  The exception will not be difficult for police
            officers to apply because in each case it will be circumscribed by
26          the exigency which justifies it.  We think police officers can and

> will distinguish almost instinctively between questions necessary
> to secure their own safety or the safety of the public and questions
> designed solely to elicit testimonial evidence from a suspect.

Id. at 658-59.[6]

The officer's subjective motivation in posing the questions is not determinative of whether the interrogation falls within the public safety exception. Davis v. Washington, 547 U.S. 813, 839 n.4 (2006); United States v. Reilly, 224 F.3d 986, 992 (9th Cir. 2000). The important question is whether there is an objectively reasonable need to protect the safety of the public or the police. Even if there is such a need, however, the questioning should not be "investigatory in nature" and should be "sufficiently limited in scope to allow the officers to quell the volatile situation they face[]." Reilly, 224 F.3d at 992. See also Quarles, 467 U.S. at 659 (exception does not apply to "questions designed solely to elicit testimonial evidence from a suspect"); United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008) (same). As noted by the California Court of Appeal, the Quarles "public safety" exception does not allow the police to obtain involuntary, or coerced, statements, even in exigent circumstances. DeSantis, 870 F.2d at 540.

The "public safety" exception is usually applied in circumstances where a suspect has stored or abandoned dangerous evidence that may pose a threat to officers or to the general public, and the police ask questions designed to minimize the danger. See e.g., Quarles, 467 U.S. at 651-52 (applying exception where officer asked suspect, who fled into a supermarket after committing an armed rape and was arrested wearing an empty shoulder holster, where the gun was, because an accomplice or members of public might make use of it or come upon it); United States v. Basher, __F.3d__, 2011 WL 167045 (9th Cir. 2011) (applying exception to campsite

---

[6]  In Quarles, there was an "immediate necessity of ascertaining the whereabouts of a gun which [the police] had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." 467 U.S. at 657. Further, the arresting officer "asked only the question necessary to locate the missing gun before advising [the defendant] of his rights." Id. at 659.

where weapons could have been in a tent); Allen v. Roe, 305 F.3d 1046, 1050-51 (9th Cir. 2002)

(applying exception where suspect in shooting was arrested a mile-and-a-half from the crime

scene, without the gun, because it was "reasonably possible that anyone could have found the gun

and used it"); Reilly, 224 F.3d at 992-93 (applying exception where officer asked suspect where

"the gun" was, where it was possible a gun could have been hidden nearby, the officer did not

ask his question in an attempt to link defendant to the underlying crime, and "his inquiry was

narrow, asking only a single question directed at determining the presence of the gun"); Liddell,

517 F.3d at 1008 (question about gun in car); United States v. Luker, 395 F.3d 830, 833-34 (8th

Cir. 2005) (question about dangerous items in car); United States v. Williams, 181 F.3d 945,

953-54 (8th Cir. 1999) (question about dangerous items in apartment).[7]

        Several courts, including state courts, have applied the Quarles exception in

situations where the police are attempting to find and/or protect a possible victim, as in this case,

as opposed to a police officer or members of the public in general.  For instance, in United States

v. Padilla, 819 F.2d 952 (10th Cir. 1987), the police had received a report of someone firing shots

at the defendant's residence.  Upon arriving, the police disarmed the defendant, ordered him to

lie on the ground, and patted him down to determine that he carried no other weapons.  Id. at 960.

One officer saw that there were bullet holes in a window and asked the defendant, before giving

the Miranda warnings, "How about inside the house?"  Id.  The defendant replied, "I shot

someone inside the house."  Id.  Two officers entered the apartment in search of an injured

person, and discovered weapons.  Id.  On appeal of his conviction on weapons charges, the

defendant argued that the weapons should have been suppressed because they had been

_____

        [7] Although Quarles involved questioning before Miranda warnings were given, the
Quarles "public safety" exception has also been applied in instances where questioning occurred
after the Miranda warning was given, as happened here.  See e.g, DeSantis, 870 F.2d at 541;
United States v. Mobley, 40 F.3d 688, 692-93 (4th Cir. 1994) ("Absent such circumstances
posing an objective danger to the public or police, the need for the exception is not apparent, and
the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety
motivated the questioning that all understand is otherwise improper").

discovered in a search based on the answer to a question asked in violation of the <u>Miranda</u> rule. The court rejected this argument, holding that the public safety exception applied because the police were presented with the immediate necessity of determining whether or not someone inside the house was injured, armed, or both, in order to prevent injury to the officers or further injury to anyone inside the house.

In <u>State v. Provost</u>, 490 N.W.2d 93 (Minn. 1992), the defendant came to a police station, informed officers that he had set his wife on fire, and asked that they call an ambulance. In response to the officers' questions, the defendant eventually informed them of his wife's whereabouts and took them to a wildlife refuge, where they found the wife's body. The trial court had concluded that the defendant's statements to police were admissible pursuant to the <u>Quarles</u> public safety exception. <u>Id.</u> at 96. While noting that "the true focus of the public safety exception seems more to be directed to protecting the general public from the defendant rather than to the plight of the particular victim of the defendant's actions," the state appellate court agreed with the trial court that "the facts here satisfy the spirit of the <u>Quarles</u> public safety exception." <u>Id.</u> However, the Minnesota appellate court ultimately determined the facts of that case fell more easily within California's "rescue doctrine," and adopted that rule in ruling the statements admissible. <u>Id.</u>

In other cases involving the safety of a possible victim, the <u>Quarles</u> "public safety" exception has not been applied. For instance, in <u>People v. Swoboda</u>, 737 N.Y.S.2d 821 (N.Y. City Crim. Ct. 2002), the Criminal Court for the City of New York declined to apply the public safety exception to statements made by defendants in response to police questioning regarding the whereabouts of a child born to defendants while they were using heroin. Critical to the holding in that case was the fact that the questions asked by police were not addressed to dangers posed to the public at large, and that the police did not begin intense questioning of defendants to learn about the child's whereabouts until 11 days after the child was born and over four hours after defendants were arrested. The court noted in that case that: (1) a "key" factor in

1  the Quarles decision was "the immediacy of the situation" and "exigent circumstances;" and (2)

2  the Quarles decision appeared to be addressed to "dangers posed to the public at large" and not to

3  individual persons. Id. at 221.

4          In this case, the California Court of Appeal correctly identified Quarles as the

5  controlling federal legal precedent.[8]  Accordingly, the first question before this court is whether

6  the court applied the Quarles holding in an objectively unreasonable manner when it concluded

7  that petitioner's statements to police were admissible at her trial because they fell within the

8  "public danger" exception to the Miranda rule.  Under the unreasonable application clause, "a

9  federal habeas court may grant the writ if the state court identifies the correct governing principle

10  from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's

11  case." Williams, 529 U.S. at 413.  A state court decision involves an unreasonable application of

12  United States Supreme Court authority if it "either unreasonably extends a legal principle from

13  our precedent to a new context where it should not apply or unreasonably refuses to extend that

14  principle to a new context where it should apply." Id. at 407.  See also Himes, 336 F.3d at 852-

15  53; Bailey v. Newland, 263 F.3d 1022, 1028 (9th Cir. 2001).  In making this determination, this

16  court is bound by the following general guidelines:

17  _____

18      [8] Petitioner argues that Quarles has been abrogated by Dickerson v. United States, 530
    U.S. 428 (2000).  (Petitioner's Supplemental Memorandum of Points and Authorities in Support
19  of Claim Two, filed March 23, 2009 (P&A), at 28-29.)  This court disagrees.  Decisions in cases
    decided subsequent to Dickerson reflect that Quarles survived Dickerson.  See Missouri v.
20  Seibert, 542 U.S. 600, 619 (2004) (citing Quarles approvingly in a post Dickerson case); United
    States v. Patane, 542 U.S. 630, 639 (2004) (same); Allen, 305 F.3d at 1050 n.4 (noting that the
21  rationale supporting the Quarles public safety exception to the Miranda rule has been "to some
    degree, called into question" by Dickerson but concluding that "because the Supreme Court has
22  chosen not to overrule Quarles, we cannot ignore it"); United States v. Williams, 483 F.3d 425,
    428 n.1 (6th Cir. 2007) (noting that Quarles "remains good law" after Dickerson).
23      Petitioner also argues that the state appellate court's opinion is not entitled to AEDPA
    deference because the court improperly applied California's "rescue doctrine," and not the
24  Quarles exception, to deny petitioner's Fifth Amendment claim.  (P&A at 26-27, 29-31.)  The
    undersigned disagrees.  The state court specifically cited Quarles in support of its decision,
25  described the "rescue doctrine" as a "corollary principle" to the Quarles exception, and clearly
    attempted to fit the facts of this case within both doctrines.  However, for the reasons described
26  below, the undersigned concludes that the state court's decision was based on an unreasonable
    application of Quarles.

1    The term "'unreasonable'" is "a common term in the legal world
2    and, accordingly, federal judges are familiar with its meaning."
     (citation omitted.)  At the same time, the range of reasonable
     judgment can depend in part on the nature of the relevant rule.  If a
3    legal rule is specific, the range may be narrow.  Applications of the
     rule may be plainly correct or incorrect.  Other rules are more
4    general, and their meaning must emerge in application over the
     course of time.  Applying a general standard to a specific case can
5    demand a substantial element of judgment.  As a result, evaluating
     whether a rule application was unreasonable requires considering
6    the rule's specificity.  The more general the rule, the more leeway
     courts have in reaching outcomes in case-by-case determinations.

7

8    Yarborough v. Alvarado, 541 U.S. 652, 663 (2004).

9          The Court of Appeals for the Ninth Circuit has described the Quarles "public

10   safety" exception to the Miranda rule as "narrow."  United States v. Martinez, 406 F.3d 1160,

11   1165 (9th Cir. 2005) (describing rule as one that allows "police officers, when reasonably

12   prompted by a concern for the public safety, to engage in limited questioning of suspects about

13   weapons in potentially volatile situations").[9]  Accordingly, pursuant to Yarborough, the "range of

14   reasonable judgment" with respect to application of the Quarles rule, or the degree to which the

15   rule can be applied to a fact pattern different than that present in Quarles, is "narrow."  541 U.S.

16   at 663.

17         Albeit "narrow," based on the authorities cited above, this court concludes that the

18   Quarles "public safety" exception can reasonably be extended, in an appropriate case, to a

19   situation involving the immediate safety of a victim, as opposed to the immediate safety of the

20   police or the public in general.  There is no reason to find that a known potential victim is less a

21   member of the public than unknown persons in the vicinity of the arrest.  Where there is an

22   objectively reasonable need to protect the possible victim of a crime from immediate danger, the

23

24         [9]  The Fourth Circuit has come to the same conclusion.  United States v. Guess, 2010 WL
     5260998, No. 2:10cr140 (E.D. Va. December 3, 2010), at *12 ("Cases applying the public safety
25   exception in this Circuit reflect that the public safety exception is a narrow exception to Miranda
     that typically applies when the public or officers face an *immediate* danger associated with a
26   weapon") (emphasis in original).

                                                    17

1  police should be allowed to ask questions specifically designed to secure the safety of the victim.

2  However, the questioning should be limited in scope, designed only to "quell the volatile

3  situation they face," and should not be "investigatory in nature." Reilly, 224 F.3d at 992.

4      Even if the undersigned would not independently extend Quarles, the important

5  issue is whether the state appellate court's determination that the California rescue doctrine was a

6  legitimate extension/application of the Quarles exception was a reasonable application of that

7  Supreme Court authority. Certainly, there is no Supreme Court case prohibiting such. Further,

8  the incorporations of the rescue doctrine into the exception has a common sense basis. In any

9  event, as the court has pointed out, reasonable jurists in other jurisdictions have found that the

10  rescue doctrine fits the exception already.

11     The court now turns to the second question – the application of Quarles to the

12  facts of this case.

13  *Application of the Rescue Doctrine as Incorporated Into the Quarles Exception*

14     After a careful review of the state court record, including the videotape of

15  petitioner's interrogation by Colusa County police, *and assuming for the moment that the*

16  *interrogation violated the Miranda rule,* the undersigned finds that the application of the rescue

17  doctrine by the state court of appeal was an AEDPA unreasonable application of the facts of the

18  case to the rescue doctrine as incorporated into the Quarles exception, i.e.,  that the police

19  questioning of petitioner was not initially limited in scope to the matter of a victim's safety, but

20  was mainly "investigatory in nature," and therefore would not fall within the Quarles exception.

21     After approximately two and a half hours at the scene of the vehicle stop,

22  petitioner was transported to the police station. Reporter's Transcript on Appeal (RT) at 746.

23  Petitioner was questioned at the station about a half hour after she arrived. Id. at 1178. For the

24  first 14 pages of transcript, the deputies asked petitioner general questions which had nothing to

25  do with the location of a possible victim. Supplemental Clerk's Transcript on Appeal (SCT) at

26  1- 14 (page numbers on the bottom of each page). The deputies then asked several general

questions about petitioner's "boyfriend," such as whether he had recently had "surgery" or whether petitioner had had surgery or "stitches." Id. at 15. Six pages of transcript later, the detectives asked petitioner whether she had ever shot her gun "anyplace else other than the range." Id. at 20. On the 24th page of transcript, the detective informed petitioner that he was concerned with "the car, and the blood in the car, and possibly a crime has been committed there in the car." Id. at 24. He stated, "And so, you know, you can lessen your exposure and, you know, tell us about what happened with the car, and we can, you know, maybe look at doing some things with your weapons charge, so you don't end up going to prison or jail." Id.

At that point, the deputies focused their questions on inconsistencies in petitioner's story. Id. at 24- 33. After nine more pages of transcript, the detective stated: "Well, let's – let's go right to it. I mean, there's blood in the trunk, there's a bullet hole, you got to know something." Id. at 33. He noted that the blood in the trunk was "nice and fresh" and that it was "not dry." Id. at 33-34. Petitioner still refused to admit anything other than possession of a weapon. Id. at 34-35, 38-39. Several pages later, the detective stated: "Say somebody did get shot. Well, the hospitals have to report gunshots. Maybe the guy didn't live, the person didn't live, maybe." Id. at 37-38. After asking several more general questions, the detective made the following statement:

> We could find out that somebody was murdered or shot or
> something, didn't – maybe he didn't die, that car was involved,
> you're driving the car, you're going down for accessory to
> attempted murder.
>
>                                  * * *
>
> So I think, I honestly think, that you know that that car was
> involved in something, and you don't – maybe not know exactly
> what, but it was something that wasn't quite cool, and you don't
> want to tell, because you don't want to get people into trouble.

Id. at 44.

At that point, petitioner asked about the possibility of a "deal." Id. at 49. The detective informed petitioner that it "looks like somebody may have been shot" and "got

1   whacked." Id. at 50.  Later, he speculated that "the body pops up, say there's a body." Id. at 53.

2   The deputy told petitioner the District Attorney would not be able to give her a "blanket deal

3   saying you're scott free on everything." Id. at 52.  The detective told petitioner that "the truth is

4   your best friend right now." Id. at 54.  He also mentioned the Bible and told petitioner if she

5   didn't tell the truth, it would "eat[] at your insides." Id. at 57.  He stated: "We don't care about

6   this gun charge.  That's – that's not the most important thing here, and I think we all know that."

7   Id. at 60.

8            The District Attorney then came into the room. Id. at 65.  He asked petitioner

9   whether she knew "about a dead body." Id. at 68.  He discussed petitioner's possession of the

10  gun and whether there were any narcotics in her car. Id. at 69-70.  He then stated: "Now, if you

11  got some information about somebody that got hurt, or somebody that got killed, or somebody

12  that's hurt and may be someplace where we can get to them and save them, or whatever, and you

13  want me to make a deal on the loaded gun in the car, yes, I will do that." Id. at 70.  He stated

14  they were concerned about "why we found blood in your trunk . . ." Id. at 73.  The District

15  Attorney ultimately agreed not to file charges against petitioner "for any gun charges in Colusa

16  County, California, if she tells everything she knows about the blood found in the trunk of a 1985

17  Olds that you were driving, and the I.D. of the person we believe to be missing . . . or harmed."

18  Id. at 80.  He then summarized, for the record, that he had agreed not to file charges against

19  petitioner in Colusa County if she told them "what happened," noting "we believe that something

20  has happened to this person or possibly other people." Id. at 84.

21           At that point, one of the Detectives advised petitioner, "When you do start talking,

22  so that we don't have to ask a whole bunch of questions, try to be as detailed as you can, start

23  from the very beginning all the way through." Id. at 86.  Petitioner was then asked a long series

24  of preliminary questions that had nothing to do with a possible victim. Id. at 86-88.  Finally,

25  eighty-nine pages into the interrogation, when asked whether she knew "how that blood got

26  there," petitioner stated, "Yeah, I shot him in the trunk." Id. at 89.  The detectives then asked a

20

1   large number of broad-ranging questions about the person who was shot, still not focusing on a

2   possible rescue (they asked, for example, about the victim's name, his age, his race, his address,

3   whether he was employed, etc.).  Id. at 89-94.  At that point, petitioner gave a narrative summary

4   of the crime.  Id. at 94-100.  She then informed the deputies that the victim was not dead.  Id. at

5   100.  The District Attorney responded, "He's not dead?"  Id.  After ascertaining that the victim

6   was in a hotel room in Sacramento, the District Attorney observed that "if he's still alive, he

7   might – he might need some help."  Id. at 102.  The officers' questions were then directed at

8   finding the location of the victim.  Id. at 102-135.  Ultimately, the detectives put petitioner in the

9   car in an unsuccessful attempt to locate him still alive.  Id. at 136.

10          Later that same day, petitioner was transferred to the Davis police department for

11   questioning.  Id. at 137.  She was again given Miranda warnings.  Id. at 137.  Petitioner agreed to

12   waive her rights and she discussed the crime in detail.  Id. at 137-230.  She was then informed

13   that Ruska had died.  Id. at 231.

14          It is true that there was evidence in this case of an immediate need to find a

15   possible victim: there was fresh blood and a bullet hole in petitioner's trunk.  It also appears the

16   deputies suspected someone may have been shot in petitioner's trunk and they wanted to find out

17   what had happened.  Because of this, the police would have been justified, pursuant to the

18   Quarles ruling, in asking questions for the purpose of quickly locating a victim.  Although the

19   deputies tried several times to find out the cause of the blood in the trunk, petitioner refused to

20   cooperate.  The detectives then asked a series of broad-ranging interrogation questions that were

21   purely "investigatory in nature," which eventually led to petitioner's confession.  Many of these

22   questions were not directed toward the immediate necessity of determining whether there was a

23   live victim, but instead toward obtaining general information about what had occurred.  See

24   United States v. Carrillo, 16 F.3d 1046, 1049-1050 (9th Cir. 1994) (conclusion that Quarles

25   exception applied was "buttressed by the non-investigatory nature of the officer's question" in

26   that the question "called for a 'yes' or 'no,' not a testimonial response"); State v. Hazley, 428

1   N.W.2d 406, 411 (Minn. 1988) (answer to a police question did not fall within Quarles "public

2   safety" exception because it was "not limited to the public safety consideration by which the state

3   seeks to justify it").  In that sense, there is little to distinguish the interrogation in this case from a

4   normal wide-ranging police interrogation.

5          In all of the cases reviewed by this court in which the Quarles "public safety"

6   exception has been applied, including those cited above, the police asked only one or two

7   questions designed specifically to deal with, or "quell," the emergency situation confronting

8   them.  This, on the other hand, was a broad-ranging interview, designed to elicit incriminating

9   information about the crime in general, including, but not limited to, the reason for the blood in

10  petitioner's trunk.  It was not until long after the interrogation began, and after petitioner had

11  implied that she knew something about the blood in the trunk, that the District Attorney's

12  question caused her to admit she shot Ruska.  Even then, the detectives asked a series of wide-

13  ranging questions about the victim, instead of focusing on the emergency situation which

14  confronted them.

15         The court concludes that the broad-ranging interrogation that occurred here, which

16  resulted in obtaining a confession over the length of the entire interrogation, does not fit within

17  the Quarles exception.  Indeed, the undersigned cannot conceive that this interrogation would

18  have differed at all from any other investigatory interrogation.  The fact that the situation turned

19  out to have been an emergency cannot justify the admission of petitioner's confession under the

20  narrow Quarles ruling.  Moreover, petitioner's later statements to Detective Anderson of the

21  Davis police department cannot be justified by application of either the Quarles exception or

22  California's "rescue doctrine" because at that point the police were aware that Mr. Ruska was

23  already dead.  The Quarles exception is simply not that broad.  The questions asked of petitioner

24  by the police posed great risk of eliciting non-responsive, incriminating answers and, in fact, did

25  elicit such answers.  The rationale for the Quarles exception does not justify continuing a broad

26  ranging interview after the suspect invokes her right to silence.  Based on the these

22

considerations, this court concludes that the California Court of Appeals applied the Quarles

holding in an objectively unreasonable manner.  In so finding, the undersigned is not attempting

to dilute or quarrel with the strict Harrington v. Richter AEDPA standards.  Simply put, and

again recognizing that an emergency did exist, it cannot be fairly said that the record supports the

requirements of the  Quarles exception in any way, shape, or form – *in terms of the detective*

*quickly getting to the point of the emergency in the interrogation.*[10]

In sum, as is clear from the interrogation record, the detective was either unaware

of any emergency existing at the time of the alleged (and assumed) Miranda violation – the

asserted ignoring of petitioner's attempt to remain silent – or, with knowledge of a possible

emergency, he was simply concerned with obtaining incriminating information first.  In neither

situation would Quarles come into play.  Quarles applies to a situation where an emergency to

the life of a person exists, but the case requires an interrogator aware of that fact to quickly get to

that point.

Accordingly, this court must review the remaining issues in this case in order to

resolve petitioner's Fifth Amendment claim.

### 3.  Was there a Miranda Violation in this Case?

As described above, petitioner was interrogated by Colusa County detectives and

by the Davis police department, giving detailed confessions during each interview.  Prior to trial,

petitioner filed a motion to suppress her statements to police.  Clerk's Transcript on Appeal (CT)

at 238-40, 463-77.  A hearing on this motion was held on April 2, 3, and 5, 2001.  RT at 1168, et

seq.  The facts adduced at that hearing were described by the California Court of Appeal, as set

_____

[10] The undersigned is not asserting that the California Court of Appeals justices were not "fair minded."  Rather, those justices were focused on California's rescue doctrine which may well not have had the required immediacy of purpose in questioning that Quarles requires.  The focus of this present inquiry in federal habeas is that very requirement of immediacy of purpose insofar as the rescue doctrine is incorporated into the Quarles exception.  It is *that* requirement which the undersigned views as undebatable given the present record.  Moreover, while the undersigned could understand a few background questions before getting to the emergency, such is not the case here.

1   forth above.  In addition, the following facts were established.

2          Detective Morton testified that he advised petitioner of her constitutional rights at

3   the scene of the vehicle stop, but he did not ask her at that time whether she understood her rights

4   or whether she was willing to talk to him.  Id. at 1175, 1188.  Detective Markss testified that

5   during his interrogation of petitioner at the police station, after he asked petitioner whether,

6   "understanding these rights, do you wish to talk to me now," and petitioner stated "Umm – no,"

7   Markss understood petitioner to mean "[t]hat she did not want to talk to me."  Id. at 1246.[11]

8   During a break in the interrogation, Detective Markss spoke to petitioner off the record.  Id. at

9   1275-76.  He tried to convince her to trust the District Attorney and told her that she should tell

10  the truth because it would be better for her if she did.  Id. at 1276.  While petitioner was being

11  interrogated, other deputies were attempting to determine whether there was any evidence of

12  "foul play" at the Ruska's residence, and also at the residence of another person who had been

13  associated with the automobile petitioner was driving when she was stopped.  Id. at 1332.

14          The trial court denied petitioner's motion to suppress her statements to both

15  Colusa County and Davis police, ruling as follows:

16          Regarding the Miranda advisement at the scene of the arrest, based
            on Deputy Morton's failure to recollect the defendant's response to
17          his question whether the defendant understood the advisement, and
            despite the notation in his report that she understood her rights, I'm
18          not able to conclude that the Miranda waiver was validly given in
            the field.  Therefore, it does become necessary to analyze the
19          waiver issues at the Colusa sheriff's office as shown in the
            videotape.

20
            And the record should be clear that the Court did review the
21          videotape.  I did find it exceptionally helpful and instructive to
            have seen that.  There is no way that the words of the officers
22          describing what happened in that tape could at all come close to

23

24  [11]  Upon further questioning by the prosecutor on this point, detective Markss
    reformulated his answer.  He stated that he was attempting to clarify petitioner's "no" response
25  when he continued to ask questions after she said she did not want to talk to him.  Id. at 1246.
    Later in his testimony, again upon questioning by the prosecutor on this point, the detective
26  stated that he "had a question in [his] mind about what her response meant," so he attempted to
    clarify it by continuing to question her.  Id. at 1280.

what the Court gained from viewing that tape.

Instructive, as I say, in many ways.  For example, the hearing ability of Ms. Williams which I find to be substantial, the demeanor of all the people that were involved, the process of signing the waiver form.  That's just a few things that I got from the tape that I might not have gotten from a description of what happened during the interview.

The interview there and at the Davis Police Department, I would not consider them models on how to do it right.  They would not make good training films.  I don't mean to sound facetious, but there's a lot of problems with how things were conducted.  That does not mean that the final conclusion of the Court is that those problems are so significant that the motion should be granted.  What's important is to know that there's a total context that must be looked at.

That tape was – videotape was – I forget exactly how long, but well over an hour as I recall.  It's also important to remember that there's no such thing as a script on how to do an interview, that officers have to react to what they're given.  They have to react in a very quick fashion.  Hindsight that we have today is 20/20, as it always is.  And that's not the case when officers are doing interviews under some stressful circumstances.

The total context of what goes on is important for a Court to reach a determination on whether a motion to suppress should be granted, whether the will is overborne.

Now, as to the – what appeared at first blush to be an answer no, that I don't want to talk, and whether that's ambiguous or not, Mr. Lown has argued vociferously that no means no.  But in the context that the Court viewed it, even though no generally means no, there was some ambiguity involved in that discussion.  Now, granted, there might have been some ambiguity created unintentionally by the officers in using the term, Understanding these rights or, Understand the rights, without having some other comments to preface that, there was ambiguity.  And in the total context where she says, Umm – no, this Court would find it very hard to believe that an officer could not then go on to say, You don't want to talk to me?

Be difficult for this Court to believe that if someone said, Umm – no as an answer to what was asked that there could not be a clarification.  And there was a clarification which led to, I don't care, it led to further comments, I'll talk about certain areas, and it kind of limped along.  Two steps forward, one step back in a sense.

But I believe that that clarification was proper, that there was no invocation by her statements that she wished to remain silent.

25

As to whether or not there was an improper promise of leniency, the Court does not find that to be the case.  The Court does find that there were other more significant motivations than a promise of leniency for the giving of the statement.  Those other motivations include the possibility that Mr. Ruska could still be found alive, for both humanitarian reasons and to avoid the possibility of a more serious criminal charge, if Mr. Ruska died.

Now, as far as Mr.  Poyner's recitation of the penalty for gun possession, in the light most favorable to him, it was ambiguous.  In the light least favorable to him, it was inaccurate.  But irrespective of that, the Court has no reason to doubt that Ms. Williams would understand that leniency, when it came to the gun charges, was a minimal value compared to the potentially more serious charges that she could be facing if Mr. Ruska died.

Now, even if there were a defect in the Miranda admonishment, and I'm not finding that there is, I believe under those circumstances as presented to the Court, the Rescue Doctrine, which the Court finds to be different from the – the term escapes me – Public Safety Exception finds them to be different, although there is some overlap.  But it is different in the Court's judgment.

The Court, not going through the prerequisites for the applicability, I do find that the prerequisites have been met.  Therefore, I find that the statement at the Colusa sheriff's office is admissible.

The last issue before the Court is whether the defendant's statement given to Davis police detective Anderson is admissible.

I find that Ms. Williams was given her Miranda warnings for the third time, actually, by Detective Anderson.  The defendant did indicate that she understood her rights, was willing to talk.

I don't find anything legally improper by Detective Anderson telling the defendant that Mr. Ruska had not died.  False statements, generally speaking, to defendants are not improper.  I find that they were not improper in this context.  Appellate courts have ruled that a false statement is not designed to get a factually innocent person to give a false confession.  Rather, it may be more likely to get the truth from a suspect.  And such is the case here.

We had our discussion about when would it be designed to get a false statement.  And the only one that I could come up with, with Ms. Hurd's help, was what I called the rubber hose era.  We certainly don't have that here.  If Ms. Williams knew that Mr. Ruska had died, she might have made false statements knowing that the alleged victim could not refute them.

Although she was tired and cold, I cannot find that her will was overborne.  Therefore, the motion to suppress the statement given

1   to Detective Anderson is also denied.

2   RT at 1468-70.[12]

3   An accused who wishes to invoke his or her right to remain silent must do so

4   unambiguously.  Berghuis v. Thompkins, ___ U.S. ___, 130 S.Ct. 2250 (2010).  Simply

5   remaining silent is insufficient to invoke the right.  Id. at 2259-60.  Once Miranda warnings have

6   been given, if a suspect makes an unambiguous statement invoking his constitutional rights, "all

7   questioning must cease."  Smith v. Illinois  469 U.S. 91, 98 (1984).  See also Miranda, 384 U.S.

8   at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975).  Any subsequent statements are

9   relevant only to the question whether the accused waived the right he had previously invoked.

10   Smith, 469 U.S. at 98.  "Invocation and waiver are entirely distinct inquiries, and the two must

11   not be blurred by merging them together."  Id.

12   Invocation of the right to remain silent must be construed liberally.  See Hoffman

13   v. United States, 341 U.S. 479, 486 (1951).  Thus, a suspect need not rely on any special

14   combination of words to invoke the right to silence.  Quinn v. United States, 349 U.S. 155, 162

15   (1955).  However, "[a]lthough a suspect 'need not speak with the discrimination of an Oxford

16   don,' he must articulate his desire to [invoke his constitutional rights] sufficiently clearly that a

17   reasonable police officer in the circumstances would understand the statement to be [an

18   invocation of his constitutional rights]."  Davis v. United States, 512 U.S. 452, 459 (1994).  In

19   order to determine whether a suspect invoked this Fifth Amendment right, "a court should

20

21   [12] This court will analyze the trial court's ruling as the last reasoned state court decision
    on petitioner's claims that her interrogation violated the dictates of Miranda and her Fifth
22   Amendment right to remain silent.  Medley v. Runnels, 506 F.3d 857, 862-63 (9th Cir. 2007)
    (federal habeas court analyzed state trial court ruling as "last reasoned decision" for purposes of
23   AEDPA review where state appellate courts had not discussed the issue); Edwards v. Lamarque,
    475 F.3d 1121, 1135 (9th Cir. 2007) (en banc) ("When a state trial court reaches a reasoned
24   conclusion that the appellate court subsequently does not address, traditionally we have treated
    the trial court's determination as the last reasoned decision"); Van Lynn v. Farmon, 347 F.3d
25   735, 738 (9th Cir. 2003) (federal court looked to state trial court decision as the last reasoned
    decision of the state court where state appellate courts had not issued a reasoned opinion on
26   merits of prisoner's claims).

1   examine the entire context in which the claimant spoke." Bradley v. Meachum, 918 F.2d 338,

2   342 (2d Cir. 1990) (quoting United States v. Goodwin, 470 F.2d 893, 902 (5th Cir. 1972)).

3   However, context cannot "be manufactured by straining to raise a question regarding the

4   intended scope of a facially unambiguous invocation of the right to silence." Anderson v.

5   Terhune, 516 F.3d 781, 787 (9th Cir. 2008).

6           The United States Supreme Court has rejected a per se proscription of any further

7   interrogation once the person questioned has indicated a desire to remain silent, holding instead

8   "that the admissibility of statements obtained after the person in custody has decided to remain

9   silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously

10  honored.'" Mosley, 423 U.S. at 104.  As the Supreme Court explained in Mosley, "[a]

11  reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the

12  Court in that case to adopt "fully effective means . . . to notify the person of his right of silence

13  and to assure that the exercise of the right will be scrupulously honored . . . ." Id. at 103-04.

14  (quoting Miranda, 384 U.S. at 479).  "The critical safeguard identified in the passage at issue is a

15  person's "right to cut off questioning." Id.  (quoting Miranda, 384 U.S. at 474.)

16          A person in custody may selectively waive his right to remain silent by indicating

17  that he will respond to some questions, but not to others.  Mosley, 423 U.S. at 103-04; Bruni v.

18  Lewis, 847 F.2d 561, 564 (9th Cir. 1988) (involving the right to counsel).  "Through the exercise

19  of his option to terminate questioning he can control the time at which questioning occurs, the

20  subjects discussed, and the duration of the interrogation." Mosley, 423 U.S. at 104.  "The mere

21  fact that [a suspect] may have answered some questions or volunteered some statements on his

22  own does not deprive him of the right to refrain from answering any further inquiries . . . ."

23  Miranda, 384 U.S. at 444-45.  A suspect may waive his right to remain silent selectively, waiving

24  it with regard to some, but fewer than all, topics of discussion.  United States v. Lopez-Diaz, 630

25  F.2d 661, 664 n.2 (9th Cir. 1980) (citing United States v. Lorenzo, 570 F.2d 294, 297-98 (9th

26  Cir. 1978) ("Once a person has indicated that he does not wish to talk about a particular subject,

28

all questioning on that topic must cease").  A suspect also "may revoke selectively a previously

effected comprehensive waiver."  <u>United States v. Garcia-Cruz</u>, 978 F.2d 537, 542 (9th Cir.

1992).

During the interview with Colusa County Sheriff's Deputies, after answering a

number of general questions about herself and her "boyfriend," petitioner was informed that she

had the right to remain silent and that anything she said could be used against her in court.  SCT

at 1-4.  When she was asked whether, "understanding these rights, do you wish to talk to me

now?" petitioner answered "Do I under – yeah, do I understand them?"  <u>Id.</u> at 4.  Officer Markss

then repeated, "understanding these rights, do you wish to talk to me now?"  <u>Id.</u>  Petitioner

responded, "Uhmm, no."  <u>Id.</u>

The trial court concluded that there was "some ambiguity involved" because

Officer Markss prefaced his question "do you wish to talk to me now" with the phrase

"understanding these rights," without "having some other comments to preface that."  RT at

1470.  The trial judge also explained that "in the total context" he would "find it very hard to

believe" that an officer would not ask follow-up questions, and that "clarification was proper."

<u>Id.</u>  The California Court of Appeal observed in a footnote that petitioner's response, "Uhmm –

no," was "barely audible and stated almost under her breath," whereas her later statements, "Do I

want to talk to you?" and "Oh, I don't care," were spoken in "normal, even emphatic tones."  Op.

at 21 n.3.  The appellate court did not explain the significance of this observation.

This court has also viewed the videotape of petitioner's interrogation.  When

petitioner answered "Uhmm - no," to the question "understanding these rights, do you wish to

talk to me now?" she was not looking at the interrogator, but was looking down.  However,

although spoken in a subdued, somewhat unenunciated tone, her response was audible.  But this

is beside the point, and the undersigned is not going to adjudicate whose ears are more finally

tuned – his or the Court of Appeal justices.  The critical point is that the trial court was correct in

finding ambiguity.

It is important to review the critical part of the interrogation.  If all that is looked

at is the question: "Understanding these rights, do you wish to talk to me now?", and the answer:

"Uhmm, no.", it would be an unreasonable application of Supreme Court precedent to find that

the answer to the clear question was ambiguous and not a firm invocation of the right to remain

silent.  But the immediate context of the question/answer, both before and after the referenced

question/answer leads to a wholly different conclusion.  The undersigned sets forth the *entire*

relevant part:

> Detective: ... Okay.  What I want to do is– I know they already told you your legal
> rights.  Okay, I want to go through those again.  Okay.  So I'm going to ask you
> some very specific–fairly specific questions.  So let me go through this real quick.
> You have the right to remain silent.  Anything you say, can and will be used
> against you in a court of law.
> Understanding these rights do you wish to talk to me now?
> Ms. Williams: Do I under–yeah, do I understand them?
> Detective: Understanding these rights, do you wish to talk to me now?
> Ms. Williams: Uhmm, no.
> Detective: Don't want to talk to me?
> Ms. Williams: Do I want to talk to you?
> Detective: Yes.
> Ms. Williams:  Oh, I don't care.
> Detective: Okay
> Ms. Williams: Do I have to talk to you?
> Detective: Do you have to?  No.  But, you know, I'm not going to beat you up or
> anything, so—
> [gives advice regarding a lawyer] Do you understand each of these– do you
> understand these rights?
> Ms. Williams: Yep.

SCT 3-5.

Thus, just before the "uhmm no,"Ms. Williams had a question pending after the

detective's question about whether she understood what the detective had said, and the detective

repeated his question.  Petitioner's initial query related to whether she understood her right to

remain silent.  It is not certain to which of the questions petitioner was responding when she said

"uhmm, no", i.e., her own – whether she understood her right, or the detective's – did she want to

talk.  At the very least, it was confused at this juncture by the jumble of questions.  Moreover,

petitioner's next  "I don't care" response came only mere seconds after "uhmm no;" it is illogical

to think that she had changed her mind so quickly, or that the detective's repetitive question was coercive in that it resulted in petitioner retracting her former "unequivocal" negative response.  It is much more likely that she more fully understood that she was waiving her right to remain silent, and "didn't care."  Finally, petitioner thought about it again when she next asked whether she "had to" talk to the detective, and thereafter *finally* understood that she did not have to talk, but that she was willing.  Judging from the *entire context* of the advice of rights, the undersigned would be unwilling to find that the "uhmm no" was an unequivocal demand to cease questioning.

This case is different from Anderson v. Terhune, 516 F.3d 781 (9th Cir. 2008) (en banc) in which the majority found that a defendant's statement "I plead the Fifth," was an unequivocal assertion of the right to remain silent, and that the California appellate court's determination that this statement was ambiguous was unreasonable application of Supreme Court authority.[13]  Here, as set forth above, two questions were pending when petitioner said "uhmm no," and it can hardly have been unreasonable to have found such ambiguous.  The undersigned is also well aware that an unambiguous "no" cannot be saved simply because the officers blew by that assertion and asked questions that sooner or later made the assertion appear ambiguous.  Anderson, 516 F.3d at 791.  That is not the case here.  The *immediate* context surround the "uhmm no," both *before* and after made the assertion ambiguous.

But again, the point in the AEDPA habeas context is whether the trial court's refusal to find a violation of Miranda was *unreasonable* in the way Harrington v. Richter demands that it be, before a writ can be granted.  Specifically, fair minded jurists could debate a violation of Miranda in the entire context of the advice to remain silent.

\\\\\

\\\\\

---

[13] The court also found that the detective's response, "Plead the Fifth.  What's that?", was a feigned ignorance.  If the only context surrounding the "uhmm no" was the detective's response "Don't want to talk to me?", the undersigned would have some difficulty to distinguish Anderson.

1    The undersigned now proceeds to the issue concerning petitioner's later

2 "limitation" of the questioning to which she was willing to submit.[14]  It is well established that a

3 person being interrogated may make a selective waiver of the right to remain silent.  After she

4 had been questioned for awhile, petitioner said:

5          Ms. Williams: I'm not going to keep answering all these questions.
           Detective: Well—
6          Ms. Williams– I answer any questions you have regarding the charge of the
           weapon.  That's what I'm being arrested for now.  I don't know nothing else about
7          all the other stuff, and you guys haven't cleared– made that clear to me.  So I'm
           not answering nothing else, unless it has to do with my weapons charge.

8

9 SCT 15.

10    The problem with this "limitation," is that petitioner made it a relevance

11 limitation to a series of interrelated events.  This is not the situation where petitioner was being

12 questioned about two distinct crimes which took place at different times and places.  See

13 Michigan v. Mosley, supra, (second interrogation responses about a murder unrelated to the

14 robberies at issue in the truncated first interrogation was admissible).  Nor is it the situation cited

15 to by petitioner where a limitation of questioning to citizenship status was held to preclude

16 questions about what non-related- to-his-status criminal activity (alien smuggling) had occurred

17 in a house.  United States v. Soliz, 129 F.3d 499, 504 (9th Cir. 1997), overruled on other

18 grounds, United States v. Anderson, 256 F.3d 895 (9th Cir. 2001) (en banc).  One final example

19

20          [14]  Respondent argues that any claim that petitioner's Miranda rights were violated when
the police continued to interrogate her after she tried to limit the questioning to the weapons
found in her car is unexhausted.  Respondent's Supplemental Memorandum of Points and
21 Authorities in Support of Answer to Petition for Writ of Habeas Corpus (Suppl. Answer), at 10
n.6.  The record, however, demonstrates petitioner did exhaust this claim.  On appeal, petitioner
22 raised this exact argument.  Respondent's Lodged Document A at 51-57.  Likewise, in her
petition for review to the California Supreme Court, petitioner argued that statements obtained
23 during custodial interrogation after the suspect has asserted her right to remain silent, in this case
by refusing to answer any questions beyond her possession of weapons, was a violation of
24 Miranda.  Respondent's Lodged Document E at 10.  Under these circumstances, this claim has
been exhausted.  See Wooten v. Kirkland, 540 F.3d 1019, 1025 (9th Cir. 2008) (the rule of
25 exhaustion requires that a habeas petitioner "fairly present" his federal claims to the state courts
and requires that the state's highest court has "a fair opportunity to consider ... and to correct [the]
26 asserted constitutional defect") (citations omitted).

1   of a successful limitation was demonstrated in United States v. Lopez-Diaz, 630 F.2d 661, 664-

2   665 (9th Cir. 1980), where the defendant agreed to answer inquiries about his escape status, but

3   not questions about drugs which had been found in the van.  Rather, here, petitioner was being

4   questioned for a number of temporally proximate crimes whose premises could and would

5   substantially overlap with each other.  Questions as to whether she shot the weapon, at whom, the

6   result of the shooting, were other persons in the car where the weapon was found, who owned the

7   car, and the like, were all relevant to the possession charge, i.e. they all tend to prove possession,

8   or not.  The fact that these questions are also very relevant to the more serious crimes at issue is

9   inconsequential.  Nor would *petitioner's* post-hoc subjective understanding of relevance be

10  material to whether the limitation was exceeded.  Miranda violations, here the alleged ignoring of

11  a right to remain silent limitation, are, according to the large majority of circuits, judged on an

12  objective basis.  See cases cited in DeWeaver v. Runnels, 556 F.3d 995, 1001 (9th Cir. 2009)

13  applying the objective factors of Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350 (1994), to

14  "right to remain silent" contexts.[15]  Thus, the subjective intent of the detectives in asking the

15  questions they did would not be pertinent, as would petitioner's belief that the questions went too

16  far.[16]  However, as the DeWeaver court held, the point is "not whether the *Davis* rule applies to

17  an invocation of the right to remain silent, but whether the state appellate court contravened

18  Supreme Court precedent by applying it in that manner."  DeWeaver, 556 F.3d at 1001.  Here,

19  although the trial court apparently was not focused by the parties on any selective waiver

20  argument, and the undersigned must independently review the issue, the standard remains

21  whether the detectives' questions unreasonably violated the right to remain silent as explained by

22  the Supreme Court.  And, the focus is not on finding error in a state court's analysis, the focus is

23

24          [15] The Ninth Circuit has determined thus far that it is not necessary to decide that issue.

25          [16] There can be no doubt that the intent of the detectives was to inquire about a possible
    injuring or death by shooting, and were very much less concerned about the weapons possession
26  charge.

33

1   to determine whether any reasonable argument could be made to support a no-violation finding.

2   Harrington v. Richter, 131 S.Ct. at 788.

3           Indeed, as seen below, petitioner never refused to answer any further question; she

4   merely questioned the detective at times as to the relevance of the question, heard the response,

5   and then proceeded to answer the questions.  Any reasonable interrogator would have thought

6   that he had persuaded petitioner as to the relevance and could continue to question in that

7   manner.  Similarly, petitioner's sometimes expressed confusion as to what weapon was being

8   referenced (the gun or the knife) is also inconsequential – both are potential weapons.  In

9   essence, it was no meaningful limitation at all for petitioner to assert that she was limiting her

10   answers to questions about the "weapon's charge."[17]

11          The undersigned repeats some of the questions at issue to prove the above point.

12          "Okay.  Could we talk about your boyfriend, Kevin?"  SCT at 15.  Petitioner

13   responded, "What does that have to do with my weapons charge?"  Id.  The detective responded:

14   "Well, because it's his car, right."  Id.  Of course, who owned the car might be relevant to who

15   possessed the gun found in the car for purposes of a criminal action, and petitioner was

16   apparently convinced.  Afterwards, the following exchange occurred:

17          MS. WILLIAMS:  I just don't see where all this is relevant to –

18          DETECTIVE:  Okay.  Does Kevin work there with you?

19   Id. at 15.  After several more questions regarding Kevin Ruska, petitioner again asked, "What

20   does that have to do with my weapons charge?"  Id. at 16.  The detective replied, "Because we

21   found the paperwork for his – looks like an industrial accident in the car.  Okay.  What we're

22   trying to do is we're trying to build your credibility by saying – by having you tell us exactly

23

24          [17] Of course, if during the interrogation, petitioner believed her limitation was being
     exceeded, she would have every right to terminate the interrogation.  However, what she is
25   asking the court to do here is suppress questions and answers based on her *retroactive*, subjective
     assessment that the detective surpassed the limits of her limitation.  That issue must be
26   determined on an objective basis.

what was in the car."  Id.  Again, even if the questioning was motivated in the main to

investigating a possible shooting, it was also all relevant to a weapons charge, even if that charge

had been brought by itself.

          After 17 more transcript pages of questions about petitioner's car, the blood in the

car, the gun, petitioner's driving trip, and Kevin Ruska, petitioner again requested, "Can we just

stick with the weapons questions, please, because isn't [sic] making a whole bunch of sense to

me . . ."  Id. at 33.  The detective stated, "Well, it's not making a whole bunch of sense to us,

that's why we're trying to get to the bottom of it, and maybe you can help us out."  Several

sentences after this, the detective said, "Well, let's let's go right to it.  I mean, there's blood in

the trunk, there's a bullet hole, you got to know something."  Id.  This questioning was perhaps

much more directly related to the more serious crimes, but as held above, who shot the weapon

was very relevant to who possessed it as well.

          Petitioner appears to argue that once the detective ostensibly had enough

information to incriminate petitioner about the gun possession charge, he was obligated to cease

questioning even if that questioning had some relevance to the possession charge.  The

undersigned is unaware of any established Supreme Court case holding such.  While seemingly

ceaseless, repetitive questioning may be a circumstance indicative of coercion, see Simmons v.

Bowersox, 253 F.3d 1124, 1132,-33 (8th Cir. 2001), that limit, however defined, was not

approached here.  While petitioner queried the officers about the relevance of the questioning,

she apparently agreed with their explanation of the relevance to the gun charge; she certainly did

not say that she disagreed and that was the end of the questioning.

          Even if the undersigned is in error about the apparently limitless limitation, again,

the focus of the habeas inquiry is on the " Supreme Court reasonableness" of the detectives'

interrogation.  The undersigned cannot say that fair minded jurists couldn't possibly come to the

conclusion that petitioner's limitation was not *objectively* honored.

          In addition, soon after petitioner had "limited" the questioning, it was she who

1  was asking the detective during a smoke break, <u>see</u> SCT 46, RT 1183, whether she could get a

2  deal on the gun charge.  RT 1183-84.  Petitioner asked that the district attorney be contacted.  <u>Id</u>.

3  If any limitation was in effect up to that time, it was clearly abrogated by petitioner who would

4  now be asked questions after the break about anything and everything to see if she qualified for

5  the deal on the gun charge.  Of course, there would have to be a *quid pro quo* for the deal to be

6  given.

7          Moreover, any failure to observe petitioner's limitation in the questioning has to

8  be judged at some point by the emergency or public safety <u>Quarles</u> exception discussed above.

9  At SCT 89, petitioner admitted shooting the victim in response to a question about how the blood

10  got there.  As stated above, even this question concerning the shooting would be pertinent to

11  whether she possessed the gun.  By page 100 of the SCT, petitioner had made the somewhat

12  startling comment that the victim had been alive when she got him out of the car trunk and had

13  left him in a motel.  The questioning afterwards was fairly focused on ascertaining his

14  whereabouts and condition – a fact arguably completely unrelated to the weapons possession

15  charge, but which was very relevant to saving a life.  The questioning in this respect continued

16  for some time because petitioner was vague about where she had left the victim.  At page SCT

17  110, the interrogating detective at that time stated:

18          "Okay.  We'll get back to that.  We've got to find where he is, okay.
           If he's still alive we've got to get him to a hospital.  So start
19          thinking what do you remember that he was around?  Believe me,
           you've got to remember quick...."
20

21  Thereafter, the focus of the questioning for a time was "where is he," as the questioner struggled

22  with the impreciseness of petitioner with respect to his whereabouts.  Ultimately, petitioner was

23  "packed into" a car in order for her to attempt to physically identify places to which the victim

24  might be proximate.  SCT 117, 134.

25          The undersigned concedes that while waiting for the trip preparations to be made,

26  questions were asked which by then could have had no further relevance to the weapons

1    possession charge, i.e., how petitioner had taped the victim's mouth while he was in the trunk,

2    SCT 120, what she had taken from his wallet, SCT 121-123, the fact that she had put handcuffs

3    on him, SCT 126.  However, even assuming any previously expressed limitation were in effect at

4    this point, the repetition of such statements to the jury were harmless, as they were simply more

5    details about a shooting constituting murder which petitioner had undoubtedly conceded at that

6    point.

7                        4.  Was Petitioner's Confession to Davis Police Admissible?

8                This court must also determine whether petitioner's confession to Davis police

9    was properly admitted into evidence at her trial.  Petitioner makes no serious attempt to show an

10   independent ground to bar the Davis interrogation responses.  See footnote 18 below.  The main

11   thrust of petitioner's argument assesses the impact of the "involuntary" Colusa County

12   confession on the Davis confession.  For the purpose of completeness, the undersigned will

13   analyze the issue as if the Colusa County confession was completely inadmissible.

14                 As noted above, several hours after Colusa County deputies interrogated

15   petitioner, she was turned over to the Davis authorities for questioning.  SCT at 137.  She was

16   questioned at approximately 10:00 p.m. and had gotten a "couple hours" of sleep in the past forty

17   hours.  RT at 1362; SCT at 141-42.  She was "tired and cold."  SCT at 141.  At the beginning of

18   the interview, petitioner was again given Miranda warnings by Detective Anderson and waived

19   them.[18]  Id. at 137.  Detective Anderson immediately referred to the previous interrogation by

20   _____

21           [18]  The exact exchange was as follows:

22                DETECTIVE ANDERSON:  Okay.  Okay.  You have the right to
                 remain silent, anything you say can be used against you in a court
23               of law.

24               You have the right to the presence of an attorney before any
                 questioning, if you wish.  If you cannot afford to hire an attorney
25               one will be appointed with you for [sic] free of charge.  Do you
                 understand your rights?

26

1  Colusa County authorities, stating, "So they already kind of let you know what was up the last

2  time that you were talked to." Id.  She told petitioner that she was "going to ask you some

3  preliminary type of questions that you've been asked a zillion times probably already." Id. at

4  138.  The detective stated, "I want to let you know kind of right up front that I already know a

5  little bit about the situation, most of it, the important parts.  And I want to just stress with you

6  that it's very important that you continue to be cooperative and honest." Id. at 142.  Petitioner

7  then proceeded to confess, in full, to the killing of Ruska. Id. at 143-236.

8          As described above, the state trial court determined that petitioner's confession to

9  Davis police was admissible at her trial.  The trial court noted that petitioner had been advised of

10 her Miranda rights for the third time prior to the interrogation, and concluded that petitioner was

11 not subject to coercion during that interview, notwithstanding the fact that she was tired and cold

12 and was falsely told that Mr. Ruska had not died.  Petitioner argues that coercive practices

13 occurring at the interrogation by Colusa County police tainted the Davis interrogation and

---

14

15          MS. WILLIAMS:  Uh-huh [affirmative].

           DETECTIVE ANDERSON:  Okay.  Do you mind talking to me?
16         Okay.

17         Okay.  Do you want this other blanket?

18         MS. WILLIAMS:  Yeah.
   Id.
19
   Petitioner makes a feint at the fact that petitioner never expressly stated that she would waive her
20 Fifth Amendment rights.  Petitioner's Memorandum of Points and Authorities in Support of
   Claim Two (P&A) at 7.  In the beginning of the interrogation, the detective had advised
21 petitioner about her rights; petitioner indicated that she had been through this before, but that she
   understood her rights when orally advised about them again.  SCT 137.  However, immediately
22 after asking the question about whether she wanted to waive her rights, the detective was
   distracted by petitioner's need for a blanket.  After the blanket was procured, the interrogation
23 started without another question about whether petitioner agreed to proceed.  Through the
   remainder of the interrogation, petitioner never once stated or intimated that she had not agreed
24 to answer questions.  In such a situation, the law assumes that petitioner waived her rights. See
   United States v. Crews, 502 F.3d 1130, 1140 (9th Cir. 2007).  Specifically, "a suspect may
25 impliedly waive the rights by answering an officer's questions after receiving Miranda
   warnings." United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (quoting United
26 States v. Rodriguez-Preciado, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005.))

rendered it inadmissible.  (P&A at 23-25.)  Because the trial judge concluded that the

interrogation by Colusa County police did not violate petitioner's constitutional rights, he did not

address whether any coercive practices occurring at the interrogation in Colusa County tainted

the second interrogation by the Davis authorities, nor did he make any factual findings regarding

this issue.  However, the penultimate issue is whether receipt of the Davis confession into

evidence violated established Supreme Court authority.

> a.  Did the Coercive Colusa County Interrogation Render the Davis Confession
>      Inadmissible?

Again, assuming constitutionally prejudicial error in the Colusa interview for the

purposes of this section, i.e., the Colusa County deputies ignored petitioner's invocation of her

right to remain silent and disregarded her requests to limit the interrogation to the subject of the

weapons found in the car, until she confessed, the issue became whether this assumed error

tainted the second Davis confession.[19]  There is some argument to be made that not scrupulously

respecting a request to remain silent, or a limited request, is an error that per se voids subsequent

confessions. See Mosley, 423 U.S. at 104 (interrogation can be resumed after invocation of the

right to remain silent only if the demand is scrupulously honored in the first place); Oregon v.

Elstad, 470 U.S 298, 314 n.3 (1985) (contrasting the situation in its authorization of a second

---

[19]  Petitioner argues that the interrogation by Colusa County deputies was coercive over
and above the non-scrupulous honoring of the request to remain silent because: (1) interrogating
officers told her that "the truth would set her free" and that the "Bible said so;" (2) she was
informed that she could be "found to be an accomplice to a murder if she knew what had
occurred but did not tell them;" (3) she was falsely informed that drug dogs "had alerted on
several locations in the car;" (4) she was falsely told she could go to state prison on a gun charge,
when her possession of a weapon was actually a misdemeanor offense; and (5) her request to use
the telephone was denied two times.  P&A at 6, 9.  This court does not find these factors
coercive, standing alone.  Rather, the asserted coercion in this case consisted of the officers'
refusal to stop the interrogation in the face of petitioner's multiple requests to do so.  See Collazo
v. Estelle, 940 F.2d 411, 418 (9th Cir. 1991) (en banc).  However, again assuming a violation of
the right to remain silent, these factors contribute to the "totality of the circumstances"
surrounding petitioner's initial interrogation and add to the coercive atmosphere of the
questioning.  See Miller v. Fenton, 474 U.S. 104, 112 (1985) (voluntariness is to be determined
in light of the totality of the circumstances); Haynes v. Washington, 373 U.S. 503, 513 (1963)
(same).

1  questioning after an un-Mirandized first interview to "the cases . . . concerning suspects whose

2  invocation of their rights to remain silent and to have counsel present were 'flatly ignored' while

3  police subjected them to continued interrogation").  One could argue from the language utilized

4  that if the ability to admit later statements of a defendant after initially invoking the right to

5  remain silent depended on the "scrupulous" adherence to the initial right to remain silent, a non-

6  scrupulous violation of the right to remain silent would doom a later confession.  See Davie v.

7  Mitchell, 547 F.3d 297, 314 (6th Cir. 2008) ("Although police must respect a suspect's exercise

8  of his right to remain silent, police are not indefinitely prohibited from further interrogation so

9  long as the suspect's right to cut off questioning was "'scrupulously honored.'").  However, such

10  is not the case in the law, and even damning statements obtained after an initial involuntary

11  confession, may be admitted under certain circumstances.

12          Even in the situation where an invocation of one's right to counsel has been

13  unlawfully ignored, the Edwards "blanket" rule, the attenuation of any taint from such violation

14  is now presumed to be 14 days, after which the defendant may be approached for further

15  interrogation.  Maryland v. Shatzer, __U.S.__, 130 S.Ct. 1213 (2010).  In a situation where a first

16  confession has been found to be otherwise unlawfully coerced, a second confession evoked by

17  further police questioning may still be found to be lawful.  See Elstad 470 U.S. at 310 ("When a

18  prior statement is actually coerced, the time that passes between confessions, the change in place

19  of interrogations, and the change in identity of the interrogators all bear on whether that coercion

20  has carried over into the second confession"); United States v. Shi, 525 F.3d 709, 726-27 (9th

21  Cir. 2008) (if a pre-Miranda statement was coerced in violation of the Fifth Amendment, then the

22  court must suppress the defendant's post-Miranda statement unless the post-Miranda statement

23  was sufficiently attenuated from the coercion to remove any "taint" – "Our examination of the

24  degree of attenuation 'is merely another way of asking whether the subsequent confession was,

25  \\\\\

26  \\\\\

itself, voluntary'").[20]  Even in a situation where the police have deliberately withheld <u>Miranda</u> advisements until such time that the defendant has confessed, and then he re-confesses after proper warnings, the second confession is not *per se* inadmissible.  <u>Thompson v. Runnels</u>, 621 F.3d 1007 (9th Cir. 2010).

Perhaps the best illustration of the point that second confessions can be rescued from an earlier taint is the oft cited <u>Collazo</u> case.[21]

> The factors that are relevant to determining the effect of previous police coercion [on a subsequent confession] have been spelled out in <u>United States v. Patterson</u>, 812 F.2d 1188, 1192 (9th Cir.1987). They are whether (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a change in the location of the interrogation, or a change in the identity of the interrogators interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of a first statement had been removed. . .
>
> * * *
>
> We must determine "whether, granting establishment of the primary illegality, the evidence to which . . . objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint" . . . The temporal proximity of the arrest and the confession, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct are all relevant . . . And the burden of showing admissibility rests, of course, on the prosecution.

<u>Collazo</u>,  940 F.2d at 421 (finding that second interrogation was tainted by earlier coerced

---

[20]  The assumed first involuntary confession here may be contrasted with a situation where the first statement was not coerced in violation of the Fifth Amendment, even though it may have been obtained in technical violation of the <u>Miranda</u> requirements.  In those circumstances, the court should suppress the statement given after the <u>Miranda</u> warning only if that statement was not voluntarily made.  <u>See</u> <u>Elstad</u>, 470 U.S. at 313 ("a subsequent administration of <u>Miranda</u> warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement); <u>Medeiros</u>, 889 F.2d at 824-25 (although defendant's first statements were suppressed for failure to give <u>Miranda</u> warnings prior to custodial interrogation, second statement made by defendant was not suppressed because it was voluntary).

[21] <u>Collazo v. Estelle</u>, 940 F.2d 411 (9th Cir. 1991).

statement where, "most important," the interrogating officer "opened the second exchange by referring explicitly to their earlier discussion" and asked Collazo if he remembered "all the rights we advised you of earlier," thereby evoking the earlier exchange). Also in Collazo, the defendant had been permitted to visit with his wife during a three hour break separating the first attempted interrogation and the second one in which Collazo waived his rights.

On the other hand, a separation from the officers allegedly violating a defendant's constitutional rights is a very important factor in determining whether a post-violation confession is admissible. Lyons v. Oklahoma, 322 U.S. 596, 602, 604 (1944) (coercion consisting of physical violence was dissipated by a twelve hour break, change of location, and change of interviewer to a warden with whom the defendant was acquainted).

In this case, there was an approximately eight-hour break between the conclusion of the Colusa County interrogation and the commencement of the interrogation by the Davis police, although petitioner was in police custody that entire time.[22]  The location of the second interrogation was different from the location of the first interrogation, and the identity of the interrogating officers was different. Petitioner was given Miranda warnings at the beginning of the questioning by Davis authorities. The undersigned has reviewed the Davis transcript and nothing therein could be construed as threatening to petitioner or even rude. Indeed, when petitioner said she was cold, she was given a blanket during the interrogation. All of these factors are relevant to determine whether the coercive practices that resulted in petitioner's first

---

[22]  Petitioner's police interview at the Colusa County Sheriff's Department began at approximately 10:30 a.m. RT at 1178. The interview took approximately three hours, or until approximately 1:30 p.m. RT at 1181, 1335. After the interview was concluded, petitioner accompanied several officers in a police car in an attempt to locate Ruska. RT at 1184, 2478-83. After driving on the Interstate 5 and Interstate 80 freeways, passing several towns, and driving into Sacramento without finding Ruska, petitioner finally directed the officers to the hotel in Davis where Ruska's body had already been found. Id. at 2483, 2601, 2611-12. At that time, petitioner was turned over to two Davis police officers who were at the hotel. Id. at 2483. Davis police detective Anderson contacted petitioner at the Davis police department at about 6:30 p.m. RT at 1346-49. Petitioner was already in the police department at the time Detective Anderson reached the station. Id. Officer Anderson commenced petitioner's interrogation at approximately 10:00 p.m. RT at 1349, 1362.

1  confession had dissipated by the time the second interrogation took place.

2          On the other hand, the interrogation by Davis authorities took place on the same

3  day and involved the same crime as the first interrogation.  Compare Mosley, 423 U.S. at 104-05

4  (second confession admissible where interrogation was conducted two hours after the first, in a

5  different location, by a different officer, regarding a different crime) Grooms v. Keeney, 826 F.2d

6  883 (9th Cir. 1987) (second confession admissible where interrogation was four hours after the

7  first, by officers from a different jurisdiction, regarding primarily a different crime).  Petitioner

8  was told by the Davis police officer that she should "continue" to cooperate with authorities.

9          The undersigned decides this issue by comparing the circumstances of this case

10 with those in United States v. Jenkins, 938 F.2d 934 (9th Cir. 1991).  In that case, upon his arrest,

11 defendant had actually been beaten by the police after he had previously attempted to flee while

12 shooting at the police.  He was also threatened with death – "They [previous unrelated shooting

13 assailants] should have killed you, but that's okay, we'll do it."  The trial court also had found

14 that on the way to the police station they stopped at the Los Angeles Forum parking lot, showed

15 Jenkins a gun which they were purportedly going to plant on him, and shoot him while he tried to

16 escape.  Eventually, Jenkins made it to the police station unscathed except for the initial beating.

17 After receiving medical treatment, petitioner confessed to having the unlawful weapons found in

18 the search of his residence.  The confession took place about five hours after his arrest.

19         The Ninth Circuit found the first confession coerced on account of the pre and

20 post-arrest police conduct.  There was no issue of being improperly advised of his rights.  The

21 Jenkins court also found a second confession inadmissible which had been obtained

22 approximately five hours after the first confession.  However, unlike the first confession, the

23 Ninth Circuit did not find the second per se inadmissible.  Rather, that court analyzed whether

24 the taint caused by the initial conduct still affected the second confession.  "Specifically, we look

25 to the temporal proximity of the coercive misconduct to the confession, the presence of

26 intervening circumstances which attenuate and dissipate the coercive effects of that misconduct,

43

1    *and, particularly, the purpose and flagrancy of that misconduct*." <u>Jenkins</u>, 938 F.2d at 941

2    (emphasis added and citing Supreme Court authority); <u>see also</u> <u>Collazo</u>, <u>supra</u>.  Utilizing those

3    factors, the Court did not find sufficient time between the commission of the flagrant misconduct

4    and the second confession.

5            For the purposes of analysis here, the undersigned has assumed that the Colusa

6    County detective either should have stopped interrogation immediately after the "uhmm no," or

7    more strictly limited questions to the gun charge.  However, this misconduct falls on the other

8    side of the scale from the misconduct found in <u>Jenkins</u>.  Although the Davis detectives

9    referenced the earlier confession, primarily for background purposes, there was no attempt to

10   dwell upon it.  There was certainly no threat to take action should petitioner not confess again,

11   precisely as she had to the Colusa personnel.  Rather a significant amount of time separated the

12   two interrogations, different police and locations were involved, the Davis interrogation was very

13   low key.  If the undersigned is to look "particularly" at the "purpose and flagrancy" of the Colusa

14   (assumed) misconduct, that factor does not weigh in favor of suppressing the second

15   confession.[23]

16           The undersigned recognizes that petitioner had already confessed to the shooting

17   of Ruska and had participated in an unsuccessful attempt to find him, thereby "letting the cat out

18   of the bag."  See <u>United States v. Bayer</u>, 331 U.S. 532, 540 (1947) (a defendant who has once let

19   the "cat out of the bag" by confessing to a crime is "never thereafter free of the psychological and

20   practical disadvantages of having confessed [and] can never get the cat back in the bag").

21   However, the cat metaphor was substantially discounted by the <u>Oregon v. Elstead</u> court, 470 U.S.

22   at 311-312, and does not stand as a reason to invalidate the second confession.  Nothing in the

23   Davis interrogation indicates that petitioner was "resigned to her fate" on account of previous

24

25           [23] The Davis police interrogator also took pains to make petitioner comfortable and to
     ensure that she was coherent enough to withstand an interview at that time.  Simply being
     "exhausted," is insufficient reason to find that petitioner could not competently understand her

26   rights, as she affirmatively indicated, and assert those rights if she so desired.

44

misconduct in the Colusa confession.  Rather, she was matter of fact cooperative during the Davis interrogation.

Given that the other factors involved in analyzing the "taint" issues surrounding the second confession are in equipoise – looking at the best case for petitioner – the lack of flagrant misconduct with respect to the Colusa interrogation requires that the Davis confession be upheld.  Accordingly, the undersigned independently finds that the trial court's validation of the Davis confession to be reasonable and far from an "unreasonable application" of Supreme Court authority.[24]

5.  Was the Admission into Evidence of Petitioner's Confessions Harmless?

Still traveling the path of assumed Colusa County confession error, the issue then becomes whether the admission of the Colusa County admissions, along with those of the valid Davis admissions, was harmful error.

Where an involuntary confession is improperly admitted into evidence at trial, a reviewing court must apply a harmless error analysis to determine whether its admission was "harmless beyond a reasonable doubt."  Arizona v. Fulminante, 499 U.S. 279, 308 (1991).  In the context of habeas review, the standard is whether the error had substantial and injurious effect or influence in determining the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Williams v. Stewart, 441 F.3d 1030, 1051 (9th Cir. 2006).  See also Fry, 551 U.S. at 121-22 ("in § 2254 proceedings a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, 507 U.S. 619, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California], 386 U.S. 18").  This analysis must be conducted with an awareness that

---

[24] AEDPA deference cannot be given the state court's finding *per se* in that this section presumes Colusa misconduct, and of course, that had not been found by the trial court. Nevertheless, the focus remains on whether admission of the Davis confession was an *unreasonable* application of Supreme Court authority.

1  "a confession is like no other evidence," and that "a full confession may have a 'profound

2  impact' on the jury." Fulminante, 499 U.S. at 296.

3          However, the Supreme Court has recently found that Fulminante is not a *per se*

4  harmful error.

5          The Court of Appeals appears to have treated Fulminante as a per
   se rule of prejudice, or something close to it, in all cases involving
6          suppressible confessions. It is not. In Fulminante five Justices
   made the uncontroversial observation that many confessions are
7          powerful evidence. See, e.g., 499 U.S., at 296, 111 S.Ct. 1246.
                                        ***
8          To the extent Fulminante's application of the harmless-error
   standard sheds any light on the present case, it suggests that the
9          state court's prejudice determination was reasonable. Fulminante
   found that an improperly admitted confession was not harmless
10         under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17
   L.Ed.2d 705 (1967) because the remaining evidence against the
11         defendant was weak. The additional evidence consisted primarily
   of a second confession that Fulminante had made to the
12         informant's fiancee. But many of its details were not corroborated,
   the fiancee had not reported the confession for a long period of
13         time, the State had indicated that both confessions were essential to
   its case, and the fiancee potentially "had a motive to lie." 499 U.S.,
14         at 300, 111 S.Ct. 1246. Moore's plea agreement, by contrast, ended
   the government's investigation well before trial, yet the evidence
15         against Moore was strong. The accounts of Moore's second
   confession to his brother and his accomplice's girlfriend
16         corroborated each other, were given to people without apparent
   reason to lie, and were reported without delay.

17

18 Premo v. Moore, __U.S.__, 131 S.Ct. 733, 744-45 (2011).

19         In this case, admission of the Colusa County confession, if error at all, was

20 harmless.  First, petitioner's involvement in the actual shooting would have been proven by

21 evidence obtained entirely independent of the confessions.  As the record shows, the victim was

22 found prior to petitioner arriving at the motel room with the police.  Respondent cites the

23 testimony of the motel manager to the effect that petitioner rented the room where Kevin Ruska

24 was found.  Suppl. Answer at 26.  He also cites the testimony of police officers regarding the

25 stop of petitioner's vehicle; petitioner's suspicious conduct; her lies about whether she possessed

26 a weapon; the discovery of a loaded gun, a nine millimeter bullet, and a knife in petitioner's car;

and her subsequent arrest.  Id. at 27, 31.  Respondent also cites testimony that the gun found in petitioner's vehicle was not registered, that documents with Kevin Ruska's name were found in the vehicle, and that there was a bullet hole and blood in the trunk of the car.  Id. at 28-29, 31. He cites testimony to the effect that Kevin Ruska was bound, gagged, handcuffed, and tied to an overturned chair when he was found in the motel room by police and hotel employees.  Id. at 29-30.  The room curtains were duct taped to the walls and there was duct tape on the floor near Ruska's body.  Id. at 30.  Petitioner's palm print and fingerprints were found on items in the motel room.  Id. at 31.  An empty box of nine millimeter cartridges and an empty box of handcuffs similar to those found on Ruska's wrists were found in petitioner's apartment.  Id. Respondent also cites evidence to the effect that Ruska died from a gunshot wound fired from more than two feet away, that he had been shot by another individual, that he was lying on his back in the trunk when he was shot, and that he had died between ten to sixteen hours prior to the discovery of his body.  Id. at 32.  A California Department of Justice Criminalist opined that the bullet recovered from the trunk of Ruska's vehicle was fired from the gun seized from the car driven by petitioner and that the bullet was fired approximately two feet away from Ruska.  Id. Finally, respondent cites the testimony of Ruska's aunt to the effect that petitioner and Ruska had broken off their romantic relationship approximately three weeks prior to the murder, that Ruska continued to drive petitioner to and from work after the breakup, and that the evening preceding Ruska's murder she overheard Ruska's telephone conversation with petitioner wherein he told petitioner it was the last time he would drive her and that he wanted her to give him gas money. Id.

However, the above evidence does not completely establish the degree of culpability of petitioner's actions, i.e., whether the murder was first or second degree, or even some type of manslaughter (although the victim's circumstances at the time he was found, tied up and left to die, don't leave much to the imagination.)  But, the Davis confession, independently and without any need of corroboration from the Colusa confession, filled in

47

1    whatever gaps there may have been.  The Davis confession particularly detailed the rather callous

2    acts of petitioner in leaving her then alive victim to die.  The victim appears to have died from

3    blood loss and there appeared to have been a very reasonable chance that petitioner would have

4    lived had he not been so roughly treated after the shooting.

5          The undersigned understands that "[t]he question posed for us by [the harmless

6    error] standard is not whether the evidence was sufficient or whether the jury would have decided

7    the same way even in the absence of the error.  The question is whether the error influenced the

8    jury."  Arnold v. Runnels, 421 F.3d 859, 869 (9th Cir. 2005).  However, it is also whether the

9    error *substantially* affected the jury.  Id.; see also Sims v. Brown, 425 F.3d 560, 570-571 (9th

10   Cir. 2005) (overwhelming independent evidence indicates no substantial harm in erroneous

11   admission of evidence).

12          To find under these circumstances powerful direct and circumstantial evidence

13   linking petitioner to the shooting, plus a valid, stand-on-its-own confession filling in all the

14   details permitting a first degree murder conviction, along with the "lesser" crimes of kidnaping

15   and carjacking, that the admission of the Colusa confession substantially affected the verdict

16   would be to find Fulminate error as *per se* error.  There was no substantial harm from admission

17   of the Colusa confession even assuming error in its admission.

18         *Conclusion to Confession Section*

19          The undersigned finds no AEDPA constitutional error in the admission of either

20   the Colusa or Davis confessions as the undersigned has applied AEDPA in its various standard

21   permutations for the different issues involved.  Even assuming AEDPA constitutional error with

22   respect to the Colusa confession, the undersigned finds the Davis confession admissible after

23   independent AEDPA review.  Again assuming error with respect to admission of the Colusa

24   confession, the undersigned finds no substantially harmful affect on account of its admission.

25   Petitioner is not entitled to relief for alleged errors related to her two confessions.

26   \\\\\\

48

B.  <u>Jury Instruction Error</u>

Petitioner's next claim is that the trial court violated her right to due process when it erroneously responded to a jury question and failed to give a requested instruction on "necessity."  Am. Pet. filed Sept. 13, 2006, at 5-6.  She argues:

> One of the jurors complained that the court had not really addressed the emotional state issue as requested.  The court refused to explain further.  In so doing, the court implied to the jury that petitioner's fear was irrelevant and never instructed them that necessity was a defense.  The jury was told in essence, that if she did the act, and intended to do the act, she was guilty.  Reversal is required.

<u>Id.</u> at 6.

The California Court of Appeal denied these claims on the merits on direct appeal. Respondent's Lodged Documents A & D.  The California Supreme Court summarily denied the claims on petition for review.  Respondent's Lodged Documents E & F.  The California Court of Appeal fairly described the background to these claims and its decision thereon as follows:

> <u>Response to Juror Inquiry/Necessity Instruction</u>
>
> During deliberations, the court received a note from the jury asking whether defendant's "state of mind" during the charged incidents should "influence our decision" and seeking a better definition of specific and general criminal intent.
>
> In response, the court referred the jurors to the definitions of specific and general intent by CALJIC number, gave them a hypothetical example demonstrating general intent, and told them that motive such as need, jealousy, revenge or fear was to be distinguished from the mental state required to commit a crime. The court advised that "[i]f the necessary criminal intent and all elements of a crime have been proven beyond a reasonable doubt, a person will be guilty of the crime regardless of his or her motive."
>
> Combining two disparate legal arguments under one heading, defendant contends that the court's response to the jury's inquiry was erroneous and that the "problem" was exacerbated by the court's failure to give defendant's own proposed instruction on necessity.
>
> The first half of the claim is unsupported by developed legal argument or citation of authority demonstrating how the jury was misled; we therefore deem it abandoned.  (<u>Ochoa v. Pacific Gas &</u>

49

Electric Co. (1998) 61 Cal.App.4th 1480, 1488, fn. 3, 72 Cal.Rptr.2d 232, and cases cited therein.)

We also reject defendant's contention that the court erred in refusing to give a necessity instruction.  "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency."  (People v. Pepper (1996) 41 Cal.App.4th 1029, 1035, 48 Cal.Rptr.2d 877.)

Viewing the record most favorably to the defendant, the predicate facts to support the instruction were nonetheless missing.  Even if Ruska tried to push defendant out of the car and said "hateful things" to her, there were far less drastic alternatives than ordering him at gunpoint into the trunk and driving for 12-14 hours across two state lines.  Likewise, assuming defendant truthfully testified that Ruska lunged and threatened her when she opened the trunk, defendant had many less lethal options other than to shoot Ruska at close range, bind and gag him, and leave him to die slowly and helplessly in a motel room.  Finally, any threat Ruska may have posed to defendant's physical safety was precipitated by her own actions.

Because defendant's explanation, even if believed, was insufficient as a matter of law to satisfy the elements of a necessity defense, that instruction was properly refused.

(Op. at 12-14.)

A challenge to jury instructions does not generally state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085-86 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  Where the challenge is to a failure to give an instruction, petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

1          A trial judge enjoys "wide discretion" in responding to a question from the jury.

2   Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003).  See also Gilbrook v. City of

3   Westminster, 177 F.3d 839, 860 (9th Cir. 1999) (trial judges have "substantial latitude in

4   tailoring jury instructions"); Wilson v. United States, 422 F.2d 1303, 1304 (9th Cir. 1970) ("The

5   necessity, extent and character of additional instructions are matters within the sound discretion

6   of the trial court.")  To obtain habeas relief following an allegedly erroneous response to a jury's

7   request for clarification, a petitioner must show that (1) the response was an incorrect or

8   inaccurate application of state law, (2) constitutional error resulted and (3) the error was not

9   harmless.  Morris v. Woodford, 273 F.3d 826, 833 (9th Cir. 2001).  To determine whether the

10  error was harmless, this court must consider whether the error had a "substantial and injurious

11  effect or influence on the jury's verdict."  Id.  A jury is presumed to understand a judge's answer

12  to its question.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).

13          1.  Trial Court's Response to Jury Question

14          The first part of petitioner's jury instruction claim is that the trial judge's response

15  to the jury's question was erroneous and violated her right to due process.  As described above,

16  the California Court of Appeal rejected this claim on the grounds that it was not supported by

17  sufficient legal argument or citation to authority.  Respondent argues that the state court's

18  decision constitutes a procedural bar which precludes this court from addressing the merits of the

19  claim.  May 17, 2007 Answer at 11-13.  Respondent also argues that the claim fails on the merits.

20  Id. at 13-17.

21          Assuming arguendo that petitioner's claim is not barred, it should be rejected on

22  the merits.  Petitioner has failed to show that the trial court's response to the jury's question was

23  incorrect or an inaccurate application of state law or that it rendered petitioner's trial

24  fundamentally unfair.  In part, the trial court referred the jury back to several constitutionally

25  adequate jury instructions.  This was not improper.  See Weeks, 528 U.S. at 234 (no

26  constitutional violation where trial judge responded to the jury's question by directing its

1  attention to the paragraph of the constitutionally adequate instruction that answered its inquiry);

2  United States v. McCall, 592 F.2d 1066, 1068-69 (9th Cir. 1979) (where the district court's

3  original instructions were a correct statement of the law and "generally addressed the jury's

4  question . . .," the court's re-reading of its original instructions in response to the question was

5  not reversible error). The trial judge also gave the jury an illustration of general intent. He

6  explained:

7          I also want to give you an example of general intent. I'm not going
           to give examples of specific intent because they're specifically
8          stated and I think may be easier to understand than the concept of
           general intent.

9
           And the example I give is as follows: Someone is on an elevator.
10         The elevator stops, the doors open, the person sees someone in
           front of the door and intentionally runs into that person. The
11         person on the elevator has committed a battery.

12         Now, we have the same scenario. The person on an elevator, doors
           open, this time the person isn't paying attention, doesn't see the
13         person outside the elevator and runs into them just as hard as he
           did when he intended to do so. He did not have intent to hit him.
14         Even though injuries may be suffered, they're the same as the
           person intentionally running in. What we have there is no general
15         intent. No intention to commit the crime. It's an accident. And
           the crime of battery is not committed.

16

17  RT at 4359-60. This illustration was not incorrect or prejudicial, and it has not been challenged

18  by petitioner.

19          In addition, a review of the jury instructions as a whole reflects that the trial court

20  adequately instructed the jury on the mental states required for a finding of guilt on the charged

21  crimes. See e.g., CT 694-95, 720, 743-44, 747, 780. The trial court did not "impl[y] to the jury

22  that petitioner's fear was irrelevant," as petitioner claims. On the contrary, the jury was

23  instructed that:

24         The killing of another person in self-defense is justifiable and not
           unlawful when the person who does the killing actually and
25         reasonably believes that there is imminent danger that the other
           person will either kill her or cause her great bodily injury, and that
26         it is necessary under the circumstances for her to use in self-

1      defense force or means that might cause a death of the other person
    for the purpose of avoiding death or great bodily injury herself.

2

3      A bare fear of death or great bodily injury is not sufficient to justify
    a homicide.  To justify taking a life of another in self-defense, the
    circumstances must be such as would excite the fears of a

4      reasonable person placed in a similar position, and the party killing
    must act under the influence of those fears alone.

5

6      The danger must be apparent, present, immediate and instantly
    dealt with, and it must so appear at the time to the slayer as a
    reasonable person, and the killing must be done under a well-

7      founded belief that it is necessary to save oneself from death or
    great bodily harm.

8

9  RT at 4285; CT at 733.

10        The decision of the California Court of Appeal that petitioner's right to due

11 process was not violated by the trial court's response to the jury's questions is not contrary to or

12 an unreasonable application of federal law.  Accordingly, petitioner is not entitled to relief on this

13 claim.

14             2.  <u>Failure to Instruct on Defense of Necessity</u>

15        Petitioner also argues that the trial court erred in failing to instruct the jury on the

16 defense of necessity.  As explained above, the California Court of Appeal concluded that the

17 facts, viewed most favorably to petitioner, did not support a necessity instruction under state law.

18 If anything, the state appellate court's opinion on this question was an understatement; even

19 under the circumstances described by petitioner on the witness stand, she "had many less lethal

20 options other than to shoot Ruska at close range, bind and gag him, and leave him to die slowly

21 and helplessly in a motel room."  Op. at 13.  The facts of this case simply did not justify a jury

22 instruction on necessity.  Accordingly, the trial court's failure to give such an instruction did not

23 rise to the level of a due process violation.

24 V.  <u>Conclusion</u>

25        For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

26 application for a writ of habeas corpus be DENIED.

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within fourteen days after service of the objections.  The parties are

7    advised that failure to file objections within the specified time may waive the right to appeal the

8    District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In his objections

9    petitioner may address whether a certificate of appealability should issue in the event he files an

10   appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases

11   (the district court must issue or deny a certificate of appealability when it enters a final order

12   adverse to the applicant).

13   DATED: February 18, 2011

14                                    /s/ Gregory G. Hollows

15                               UNITED STATES MAGISTRATE JUDGE

16

17   8:williams58.hc

18

19

20

21

22

23

24

25

26

54